## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GLORIA RODGERS, | ) | CASE NO. 8:10CV46 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| DATA TRANSMISSION NETWORK, | ) | |
| CHRIS WHITTINGHILL, and SHERI | ) | |
| WASHBURN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 96). For the reasons discussed below, the Motion will be granted.

## FACTUAL BACKGROUND

The following facts are those that are stated in the briefs and supported by pinpoint citations to evidence in the record, that the parties have admitted, or that the parties have not properly resisted as required by NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

Defendant Data Transmission Network ("DTN") is in the business of delivering energy, weather, agricultural, and trading markets data to businesses. In January of 1992, DTN hired Plaintiff Gloria Rodgers to fill a part-time telephone sales job in DTN's Teleservices Department. In this position, Rodgers sold DTN's communications systems. In July of 1992, DTN offered Rodgers a full-time position in its Teleservices Department.

---

[1] *See* NECivR 56.1(b)(1) (emphasis in original):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

DTN had an employment application which, on or about August 13, 1992, Rodgers read and then signed.  That employment application stated:

> I further acknowledge that my employment may be terminated, and any offer of employment, if such is made, or my acceptance of an employment offer, if such is to occur, may be withdrawn, with or without cause, and with or without prior notice, at any time, at the option of the company or myself. I understand that no representative of the company other than the Chairman of the Board, President, Executive Vice President or Senior Vice President and then only in writing, has any authority to enter into any agreement for employment for any specified period of time or to assure any other personnel action, either prior to commencement of employment or after I have become employed, or to assure any benefits or terms and conditions of employment, or make any agreement contrary to the foregoing.
>
> I understand that nothing contained in this employment application or in the granting of the interview is intended to create an employment contract between [DTN] and myself for either employment or for providing of any benefit.

(Filing No. 98-7.)

On or about December 29, 1992, Rodgers received a cover letter and employee handbook ("1993 Handbook") from DTN.  The preface to the 1993 Handbook stated that "[t]he contents of this handbook are for general information only, and are not intended to create a contract, express or implied, between the Company and its employees."  (Filing No. 99-1, at CM/ECF p. 2.)  At the bottom of that same page, the 1993 Handbook stated, "**THIS HANDBOOK IS NOT A CONTRACT**."  (*Id.*)  The conclusion to the 1993 handbook stated:

> Employment with [DTN] remains "at-will."  No statement about future employment or longevity of employment may be made by anyone in the Company except in writing signed by the President, Executive Vice President or a Senior Vice President of the Company and the employee.  No person may assure, either before or after the beginning of employment, any benefits or terms and conditions of employment, or make any agreement contrary to the personnel policies and practices of the Company unless in writing signed by the President, Executive Vice President or a Senior Vice President of the

2

Company and the employee.  Any oral or written statements to the contrary
should not be relied on by a prospective or existing employee.

(*Id.* at CM/ECF p. 10.)   An employee acknowledgment form, attached to the 1993

Handbook, which all DTN employees were required to sign and which Rodgers signed on

December 29, 1992, stated:

> I have read the [DTN] employee handbook, including the language contained
> in the conclusion section.  I understand its contents and that it is a guide to
> aid in my employment and not a binding contract.  I understand that I am
> employed at-will, and I will do my best to follow the rules and regulations of
> the Company.  I recognize that DTN reserves the right, from time to time, to
> interpret, change, modify, or suspend any of the rules, policies or procedures
> contained or described in this handbook.
>
> I understand that no representative of the Company, other than the
> President, Executive Vice President or a Senior Vice President, and then
> only in writing signed by such person and me, has any authority to enter into
> an agreement for employment for any specified period of time or to assure
> any other personal action, either before or after I become employed, or to
> assure any benefits, terms or conditions of employment, or to make any
> agreement contrary to the foregoing. I acknowledge that no oral
> representations or written statements regarding my employment can alter the
> foregoing.

(*Id.* at CM/ECF p. 12.)

The 1993 Handbook was the only employee handbook Rodgers received.  However,

the 1993 Handbook was supplemented by DTN's 1994 Non-Exempt Teleservices

Personnel Manual ("1994 Manual").  Rodgers received a copy of the 1994 manual on or

about August 2, 1994.  (Filing No. 98-6, at 236:3-237:17; Filing No. 99-2.)  In a section

titled "Employee Conduct," the 1994 Manual stated:

> It is DTN's intention to hire and retain the most qualified and responsible
> people, yet situations develop that require the Company to discipline,
> suspend or terminate an employee.  In general, employees are expected to
> follow all the Company's policies, procedures and rules.  A violation may
> result in some form of disciplinary action.

3

> ACTIONS - A verbal review with the employee to inform them what they must do to correct the problem initiates the four step process.

(Filing No. 99-2, at CM/ECF p. 4.)  The four step process included a verbal review; two different "phases" in which written warnings would be issued to the employee to indicate what the inappropriate behavior was, how to correct it, the time frame in which it must be corrected, and a statement of consequences if the behavior continued or other problems arose; and termination of employment.  (Filing No. 99-2, at CM/ECF p. 4-5.)  The 1994 Manual also listed specific behaviors that could affect one's status as an employee with DTN,[2] one of which included "[s]ubstandard quality or quantity of work," but the 1994 Manual stated that the list was "not all-inclusive," and that "[o]ther situations or behaviors may also warrant discipline, suspension or termination.  Situations will be evaluated on a case-by-case basis."  (Filing No. 99-2, at CM/ECF p. 5.)  Under a section titled "PRODUCTION STANDARDS AND PHASES," the 1994 Manual stated that "[e]ach department has a set of standards for job production, for a copy see your supervisor.  Unsatisfactory production can result in Phases."  (Filing No. 99-2, at CM/ECF p. 4.)  The 1994 Manual also stated under the section titled "WORK SCHEDULE" that "[e]mployment is 'at will,' and an employee may be terminated at any time, with or without cause." (Filing No. 99-2, at CM/ECF p. 3.)  Rodgers did not sign the 1994 Manual, nor did DTN's president, chief executive officer, executive vice president, or any of its senior vice presidents.  (Filing No. 98-6, at 237:10-17; Filing No. 99-2.)

---

[2]"Specific behaviors which may impact on the Company's operations and employee relationships may include but are not limited to" the list that followed.  (Filing No. 99-2, at CM/ECF p. 5.)

4

While Rodgers worked for DTN in its Teleservices Department, that department changed its name to "Ag Inside Sales." (Filing No. 98-6, at 192:20-193:9.) In February of 2000, Rodgers became an Ag Inside Sale representative. (Filing No. 98-6, at 196:11-15.) Rodgers remained in that position through October of 2007. (Filing No. 98-6, 196:11-15.) From 2004 to 2007, DTN outlined the yearly quotas and sales expectations of its Ag Inside Sales representatives in Ag Services Division Inside Sales Compensation Plans. The "Definitions" section of the 2007 Ag Services Division Inside Sales Compensation Plan ("2007 Compensation Plan") stated:

> Participation. . . . The Company may offer participation in the Plan to additional employees or terminate the participation of any Participant in the Plan at any time in its sole discretion during the Plan Year.
>
> Termination of Participant. A Participant who is terminated from the Plan but remains an employee of the Company, or whose employment with the Company is terminated for any reason, whether voluntarily or involuntarily, 1) is no longer a Participant in the Plan, and 2) will receive no further commissions or bonuses under the Plan, except Commissions or orders accepted by midnight of the day before the Participant is terminated from the Plan.
> . . .
> Termination of All Prior Plans. I acknowledge that effective at midnight, December 31, 2006; all prior commission plans between [DTN] and me are terminated. My sales orders accepted by the Company prior to such time shall be paid commissions based upon the then existing commission plan.

The "General Provisions" section of the 2007 Compensation Plan stated:

> Continuation of Employment. The contents of the [2007 Compensation Plan] do not guarantee employment; rather employment with DTN . . . can be terminated on an at-will basis by either the employee or DTN . . . for any reason other than those expressly prohibited by law.

5

(Filing No. 99-4, at CM/ECF p. 3-4.)  The 2007 Compensation Plan set $9,000 per month in net new revenue as a quota that DTN sales representatives were expected to meet,[3] and the "Minimum Standards" section of the 2007 Compensation Plan stated:

> Sales Representatives must maintain a monthly average of $5,500 net new revenue.  A Sales Representative who does not achieve $16,500 in first year new revenue in any 90-day period or whose monthly first year revenue is less than $5,500 per month in any consecutive two-month period will be subject to disciplinary action up to and including termination, at the discretion of management.

(Filing No. 99-4, at CM/ECF p. 2.)[4]  Rodgers signed the 2007 Compensation Plan.  (Filing No. 99-4, at CM/ECF p. 1, 4.)

On or about June 8, 2007, Rodgers received a "Minimum Standards Notice."[5]  (Filing No. 99-6; Filing No. 110, at CM/ECF p. 3 ¶ 6.)  The notice represented that Rodgers's monthly net new revenue for January was $7,469, for February was $7,145, and for March was $2,943, and stated that those amounts did not meet DTN's minimum monthly net new revenue standards.  (Filing No. 99-6.)  The notice stated that it "constitute[d] a probationary warning," that Rodgers was "expected to bring [her] revenue production to goal track immediately," and that "[f]ailure to reach the quota requirements . . . will result in further disciplinary action, up to and including termination."  (Filing No. 99-6.)  In July, August, and September of 2007, Rodgers's net new revenue production was $2,535, $5,531, and $3,715, respectively.  (Filing No. 99-7.)

---

[3]The 2007 monthly quota of $9,000/month in net new revenue had increased from the 2006 monthly quota of $7,550/month in net new revenue.  (Filing No. 99-3, at CM/ECF p. 1.)

[4]The 2007 minimum standard of $5,500/month in net new revenues had increased from the 2006 minimum standard of $5,000/month in net new revenues.(Filing No. 99-3, at CM/ECF p. 2.)

[5]Rodgers had previously received a "Minimum Standards Notice" on or about April 7, 2006.  The notice indicated that the net new revenue Rodgers produced in January, February, and March of 2006 was $7,334, $4,261, and $3,382, respectively.  (Filing No. 99-5.)

6

Rodgers participated in DTN's health care plan that provided coverage for herself and her husband.  In 2007, ING provided stop-loss insurance on DTN's medical claims, and would do so for all claims until October 1, 2007.  (Filing No. 98-4, Aff. of Angie Decker, ¶ 6.)  Under this stop-loss insurance, ING covered the cost of any claim made by a participant of DTN's medical plan beyond DTN's $75,000 deductible.  On September 27, 2007, DTN's human resources department received an email from ING in which ING asked DTN for information regarding whether Rodgers's husband had other medical insurance.

On October 1, 2007, a member of DTN's human resources department, Amanda Marshall, asked Rodgers whether her husband had insurance other than the insurance DTN provided.  (Filing No. 98-6, at 346:12-15.)  Marshall also mentioned that Rodgers's husband had a couple medical bills that were twice as much as they had been in the past.  (Filing No. 113, at CM/ECF p. 75, 347:20-23.)  Rodgers did not know the information Marshall requested, but told Marshall she would find the information and get back to her at another time.  (Filing No. 98-6, at 346:18-20.)

Some time prior to October 2, 2007, Defendant Chris Whittinghill, the director of DTN's Ag Inside Sales and Retention, had assisted in preparing a sales budget for the Ag Inside Sales Department.  Whittinghill prepared a spreadsheet that listed the net new revenue each sales representative produced from January 2007 through September 2007 (Filing No. 99-7), and reviewed the sales performance of the members of the Ag Inside Sales Department so that he could recommend appropriate sales quotas and minimum standards for the next year. During his review, Whittinghill decided to terminate the employment of the lowest performing sales representative working out of Omaha, Nebraska, and the lowest performing sales representative working out of Des Moines,

7

Iowa. Whittinghill evaluated a representative's performance based the average net new revenue an individual produced from the beginning of the year through September 2007, and the net new revenue he or she produced during the previous three months, July 2007 through September 2007.

Whittinghill excluded sales representatives from the spreadsheet if they had not been employed with DTN as a sales representative for the full period under review and their net new revenue production was low. He left those individuals off his spreadsheet because they were not being considered for termination based on his review. (Filing No. 119-1, ¶ 6.) One sales representative who had not been employed for the full period under review, however, was included in the spreadsheet. (*Id.* at ¶ 12.) Whittinghill included this sales representative on the spreadsheet because his net new revenue production was higher than other sales representatives, and his production figures would be relevant to setting the next year's quotas. (*Id.* at ¶¶ 12-13.)

The spreadsheet revealed that Rodgers's average net new revenue production was the second lowest of all DTN's sales representatives when considering both net new revenue production from the beginning of the year through September 2007[6] and when considering net new revenue production from July 2007 through September 2007. Following his review of the spreadsheet, Whittinghill determined that both Tyler Hansen, the lowest performing Ag Inside Sales representative who operated out of Des Moines,

---

[6]Rodgers's net new revenue production for May 2007 was $0. (Filing No. 99-7.) Whittinghill excluded May 2007 from his calculation of Rodgers's average net new revenue production from the beginning of 2007 through September 2007 because he believed Rodgers had taken medical leave during that time and did not want it to count against her. (Filing No. 98-1, Aff. of Chris Whittinghill, ¶ 28; *see also* Filing No. 99-7.) Rodgers notes, however, that she took leave under the Family Medical Leave Act ("FMLA") in April starting in early in that month, and that the net new revenue she produced in April was included in Whittinhill's calculations. (Filing No. 124.) Rodgers's claim under the FMLA has been dismissed. (Filing No. 38, at CM/ECF p. 13.)

Iowa, and Rodgers should be terminated. Whittinghill was not aware of any of the sales representatives' birth dates or ages when he decided Rodgers's and Hansen's employment should be terminated, and he did not consider their ages when deciding they should be terminated. (Filing No. 98-1, ¶ 34.) Whittinghill did not have access to information about the medical bills of, or claims made by, DTN employees or their family members. (Filing No. 98-1, at ¶ 36.) He was not aware of the medical condition of Rodgers's husband, and was not aware of Rodgers's medical condition except to the extent that he was generally aware that Rodgers had taken FMLA leave. (Filing No. 98-1, ¶¶ 5, 7, 36.) Whittinghill verbally advised Defendant Sheri Washburn of his decision to terminate Rodgers and Hansen, and, on October 2, 2007, sent her an email with the spreadsheet as an attachment. Neither Marshall nor Angie Decker, another member of DTN's human resources department, participated in the decision to terminate Rodgers or Hansen or provided any information to Whittinghill or Washburn about ING having inquired about alternative medical coverage available to Rodgers' husband.

On October 3, 2007, following up on their October 1, 2007, conversation, Rodgers contacted Marshall and said that her husband received Medicare A and B. On October 5, 2007, Marshal emailed another member of DTN's human resources department, Angie Decker, to inform Decker that Rodgers's husband received Medicare A and B.

On October 9, 2007, Rodgers, who was born in 1950, was advised that her employment with DTN was being terminated. DTN also terminated the employment of Tyler Hansen, who was born in 1980. Defendant Sheri Washburn offered Rodgers a severance agreement the same day she advised Rodgers that her employment was being terminated.

9

## PROCEDURAL BACKGROUND

Rodgers filed her Amended Complaint (Filing No. 7) on July 6, 2010.  Rodgers alleged that the Defendants violated the Age Discrimination in Employment Act ("ADEA"), the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and the Employee Retirement Income Security Act ("ERISA").  Rodgers also alleged that the Defendants breached an employment contract when terminating her employment with DTN.  The Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Filing No. 23.)  The Court dismissed all of Rodgers's claims "except [her] ADEA claim against DTN only, [her] ERISA claim against DTN only, and [her] state breach of contract claim against Defendants DTN, Whittinghill, and Washburn."  (Filing No. 38, at CM/ECF p. 13.)

## STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.,* 655 F.3d 811, 819 (8th Cir 2011).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of

10

material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)), *cert. denied,* 130 S. Ct. 1074 (2010). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

"[A] plaintiff may not merely point to unsupported self-serving allegations," *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (quotations omitted), or to "'self-serving affidavits,'" *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) (internal quotations omitted) (quoting *Bacon c. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008)), to substantiate her allegations. Further, "[i]n ruling on a motion for summary judgment, the district court is not obligated to wade through and search the entire record for some specific facts which might support" a party's claim, *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (quotations omitted), and is only required to look to evidence

11

"that would be admissible before either the court or jury." *In re Zurn Plex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 314 (8th Cir. 2011) (citing Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 248), *reh'g en banc denied* (Sept. 16, 2011).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

The Defendants seek summary judgment on Rodgers's three remaining claims: (1) her ADEA, 29 U.S.C. §§ 621-634, claim against DTN;[7] (2) her ERISA, 29 U.S.C. §§ 1001-1461, claim against DTN; and (3) her wrongful termination/breach of contract claim against DTN, Whittinghill, and Defendant Sheri Washburn.

## I. ADEA Claim Against DTN

The purpose of the ADEA is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and]

---

[7]Rodgers also brought a claim under Nebraska's age act. *See* the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 to 1126 (Reissue 2010) ("NFEPA"). To the extent that this claim has not been previously dismissed (Filing No. 38), this Court's analysis of Rodgers' ADEA claim is applicable to any claim Rodgers may still have under the NFEPA. *See Billingsley v. BFM Liquir Mgmt., Inc.*, 645 N.W.2d 791, 801 (Neb. 2002) (citing 29 U.S.C. §§ 621 to 634; *Humphrey v. Neb. Pub. Power Dist.*, 503 N.W.2d 211 (1993)) ("This court has previously stated that when applying the provisions of the Nebraska age discrimination act, it will look to federal decisions interpreting the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 to 634 (1994), for guidance in construing the Nebraska age discrimination act.").

to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. §621(b). Thus, the ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added); *Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1411 (8th Cir. 1997).

"Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor," and therefore, does not "authorize[ ] . . . mixed-motives age discrimination claim[s]." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2349, 2350 (2009)). Thus, under the ADEA, an employer does not "discriminate against an[ ] individual . . . *because of* such individual's age," 29 U.S.C. § 623(a)(1), unless "age [is] the 'but-for' cause of the employer's decision." *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011) (citing *Gross*, 129 S. Ct. at 2351. Consequently, although "[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity," it can "focus on those factors directly." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). Furthermore, there is no discrimination under the ADEA "[w]hen the employer's decision *is* wholly motivated by factors other than age . . . even if the motivating factor is correlated with age," at least when age is analytically distinct from the motivating factor. *Id.* (emphasis in original).[8]

---

[8]*In Hazen Paper*, the Supreme Court found that the plaintiff did not have an ADEA claim based on allegations that the motivation behind the employer terminating his employment was that his pension benefits would soon vest. *Hazen Paper*, 507 U.S. at 608-09. The Supreme Court stated:

When the employer's decision is wholly motivated by factors other than age, the problem of

"'A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence.  [W]here the plaintiff presents indirect evidence of discrimination, the court analyzes her claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Tusing*, 639 F.3d at  515 (alteration in original) (quoting *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009)); *see also Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1411 (8th Cir. 1997) (citing *Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994)); *Bigelow v. Cent. States Health & Life Co.*, No. 4:05CV472, 2007 WL 2694494, at *6 (D. Neb. Sept. 11, 2007) (citing *McDonnell Douglas*, 411 U.S. at 802, 804; *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996)).

Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff must first establish a prima facie claim of discrimination.  *Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008).  "To establish a prima facie claim of age discrimination, a plaintiff must show (1) she was at least forty years old; (2) she was terminated; (3) she was meeting the employer's reasonable expectations at the time of the termination; and (4) she was replaced by someone substantially younger."  *Bigelow*, 2007 WL 2694494, at *7 (citations

---

inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or "vested," once the employee completes a certain number of years of service with the employer. On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service.  An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

*Id.* at 611 (internal citations omitted).

omitted); *See also Loeb*, 537 F.3d at 872 (citing 29 U.S.C. § 631(a); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).[9]

"Once the plaintiff satisfies this burden, [the] defendant must offer a legitimate, non-discriminatory reason for the employment action." *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008) (citing *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir.2006)). The defendant's "burden is one of production, not persuasion;" therefore, the determination that the defendant has met its burden "'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509(1993)). "If the defendant satisfies its burden, . . . the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual." *Bigelow*, 2007 WL 2694494, at *6 (citing *McDonnell Douglas*, 411 U.S. at 802, 804). That is, the plaintiff must "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 253); *see also Bigelow*, 2007 WL 2694494, at *6 (citing *McDonnell Douglas*, 411 U.S. at 802, 804) (quoting *Rothmeier*, 85 F.3d at 1332) ("'the plaintiff retains

---

[9]*See Loeb*, 537 F.3d at 872 (citing 29 U.S.C. § 631(a); *Reeves*, 530 U.S. 133, 142 (2000)):

To establish a prima facie case, [the plaintiff] must show that (1) at the time he was fired he was over 40 (a member of the class protected by the ADEA) . . .; (2) he was otherwise qualified for the position that he had; (3) he was discharged by [the defendant]; and (4) [the defendant] subsequently hired a younger person to fill his position.

at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination.'").

Rodgers has not pointed to any direct evidence indicating that DTN discriminated against her because of her age.  Thus, in order to survive the Defendants' Motion for Summary Judgment, she must point to evidence in the record sufficient to satisfy her burden under the *McDonnell Douglas* burden-shifting analysis.  She contends that she has established her prima facie case under *McDonnell Douglas*, however, she concedes that she is unable to carry her ultimate burden of persuading the finder of fact that her age was the but-for cause of DTN's decision to terminate her employment.  Even if Rodgers could establish her prima facie case, the Court agrees that she is unable to carry her ultimate burden.

DTN has produced evidence indicating that the decision to terminate Rodgers was because the data Whittinghill compiled in his spreadsheet indicated Rodgers was the lowest performing Ag Inside Sales representative operating out of DTN's Omaha office. At approximately the same time DTN terminated Rodgers's employment, DTN terminated Hansen's employment because the data Whittinghill compiled in his spreadsheet showed that he was the lowest performing sales representative operating out of DTN's Des Moines office.  Hansen was only in his twenties at the time the decision was made that he would be fired.  Furthermore, Rodgers has asserted that her ADEA claim is based on allegations that DTN's decision to terminate her employment was motivated by increasing health care costs, a characteristic that, although it tends to be positively correlated with age, as Rodgers acknowledges, is analytically distinct from age.  *See Hazen Paper*, 507 U.S. at 611; *see also  Gross*, 129 S. Ct. at 2350 ("Our inquiry therefore must focus on the text of

16

the ADEA to decide whether it authorizes a mixed-motives age discrimination claim. It does not.").

Rodgers has not pointed to any evidence indicating that "age discrimination was the real reason" DTN fired her.  *See  Tusing*, 639 F.3d at 516 (citing *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 872–73 (8th Cir.2009); *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897–98 (8th Cir.2004)).  Accordingly, as it relates to Rodgers's ADEA claim against DTN, the Motion for Summary Judgment will be granted.

## II.  ERISA Claim Against DTN

Section 510 of ERISA prohibits an employer from "discharg[ing] a participant in an employee benefit plan 'for exercising any right to which he is entitled under the provisions of an employee benefit plan' (retaliation) or 'for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan' (interference)."  *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1042 (8th Cir. 2010) (quoting 11 U.S.C. § 1140).  Similar to an ADEA claim, "[a]n ERISA-based retaliation or interference claim can be established through direct evidence, or in the absence of direct evidence, through the *McDonnell Douglas* three-part burden-shifting framework." *Id.* (citing *McDonnell Douglas*, 411 U.S. 792 (1973); *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1035 n. 7 (8th Cir.2007)).

To establish a prima facie case of ERISA retaliation or interference, the plaintiff must show: "(1) she participated in a statutorily protected activity (i.e., making a reasonable claim for ERISA benefits); (2) an adverse employment action was taken against her; and (3) a causal connection existed between her participation in a statutorily protected activity and an adverse employment action." *Manning*, 604 F.3d at 1043.  Under the third element

17

of the plaintiff's prima facie case, the requisite causal "connection may be established either through direct evidence of retaliation or circumstantial evidence 'such as proof that the discharge followed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive.'" *Matthews v. Trilogy Commc'ns., Inc.*, 143 F.3d 1160, 1166 (8th Cir. 1998) (quoting *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir. 1992)). However, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).

"[I]f a claimant is able to establish a prima facie case of a section 510 violation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Manning*, 604 F.3d at 1039 (citing *Rath*, 978 F.2d at 1089). If the employer satisfies its burden, "then the burden shifts back to the claimant to prove that the proffered reason is pretextual." *Id.* (citing *Rath*, 978 F.2d at 1089-90 (8th Cir.1992)).

Ultimately, this means that to establish an ERISA retaliation or interference claim, the plaintiff "must prove that [the employer] possessed 'a specific intent to interfere' with her ERISA benefits." *Id.* at 1044 (quoting *Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 992 (8th Cir.2009)); *see also Chambers v. Tavelers Co., Inc.*, 668 F.3d 559, 567 (8th Cir. 2012). "This specific intent is present where the employee's (future or present) entitlement to protected benefits is a motivating factor in the employer's decision." *Koons v. Aventis Pharm., Inc.*, 367 F.3d 768, 777 (8th Cir. 2004) (citing *Regel v. K-Mart Corp.*, 190 F.3d 876, 881 (8th Cir.1999)). In the context of an ERISA claim, a motivating factor is one that "has 'a determinative influence on the outcome.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 141 (2000)). "In other words, [Rodgers must] show that [s]he

18

would not have been terminated had [s]he not been entitled to benefits." *Id.*; *see also Teetor v. Dawson Pub. Power Dist.*, No. 4:09CV3176, 2010 WL 3789562, *4 (D. Neb. Sept. 22, 2010) (quoting *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 330-31 (1st Cir.1996)) (citing *Regel v. K-Mart Corp.*, 190 F.3d 876, 881 (8th Cir. 1999)) ("'ERISA provides no relief if the loss of an employee's benefits was incidental to, and not the reason for, the adverse employment action.  Were this not so, every discharged employee who had been a member of a benefit plan would have a potential cause of action against his or her former employer under ERISA.'").   "This specific intent can be shown with circumstantial evidence, but must be more specific than mere conjecture."  *Jefferson v. Vickers, Inc.*, 102 F.3d 960, 964 (8th Cir. 1996) (citing *Kinkead v. Sw. Bell Tel. Co.*, 49 F.3d 454, 456 (8th Cir.1995)); *see also Manning*, 604 F.3d at 1044 ("[Plaintiff] failed to generate any genuine issue of material fact that [the defendant's] stated reasons for her termination were pretextual. [Plaintiff's] assertion that [defendant] retaliated or interfered is based solely on conjecture").  The fact that the "there is no evidence that [the] decisionmakers and advisers regarding [the employee's] termination were . . . aware of [the employee's] . . . use of benefits or how her utilization of benefits compared to other employees' benefits use" suggests that the requisite specific intent is lacking.  *Guy v. Weaver Popcorn Co., Inc.*, 1:07-cv-1668-SEB-TAB, 2009 WL 1853168, *14 (S.D. Ind. June 25, 2009).

Even if Rodgers could establish her prima facie case under § 510 of ERISA, she has not pointed to evidence sufficient to establish that DTN specifically intended to deny her of any benefits.  DTN has produced evidence indicating that its reason for terminating Rodgers's employment with DTN was due to her net new revenue production, and Rodgers

has not pointed to any evidence sufficient to show that this reason was a pretext for retaliation or interference with her benefits.

Rodgers points to Whittinghill's spreadsheet as evidence of pretext.  She contends that Whittinghill manipulated the spreadsheet so that it would reflect that Rodgers was the lowest performing Ag Inside sales representative operating out of Omaha.  She asserts that he manipulated the spreadsheet by omitting lower-performing individuals from the spreadsheet and by including April 2007's revenue production when calculating her average net new revenue production even though she was on FMLA leave starting sometime in early April.  However, as it relates to omitting lower-performing individuals, the record reveals that Whittinghill had legitimate, nondiscriminatory reasons for creating the spreadsheet as he did.  He omitted lower-performing representatives from the spreadsheet if they had not worked for DTN as a sales representative for the full period under review because those individuals were not subject to termination at that time. Although he included one higher-performing sales representative who had not worked for DTN as a sales representative for the full time period under review, he did so because it was relevant to his task of determining the following year's revenue quotas.[10]  As it relates to including April 2007 in her average revenue production, the record reveals that, when reviewing the spreadsheet, Whittinghill considered not only average net new revenue production from the beginning of the calendar year up until the time of the review, but also the average net

_____

[10]As the data in the spreadsheet are laid out, it appears that excluding the higher-performing sales representative who was one of DTN's sales representatives for only part of the year did not cause Rodgers to be placed into the grouping of lower-performing sales representatives.  See Filing No. 99-7.

new revenue production from just the previous three months.[11]  The spreadsheet indicated that Rodgers's production in the three months prior to Whittinghill's review, throughout which Rodgers was not on FMLA leave, Rodgers had the lowest average net new revenue production of any sales representative listed on the spreadsheet.  The 2007 Compensation Plan, and prior compensation plans, indicated that looking to the previous three months of net new revenue production was not unusual as a means to evaluate DTN sales representatives.[12]

The record reveals that Rodgers's termination was based on this spreadsheet, and Rodgers has not pointed to anything but conjecture or speculation to suggest that Whittinghill manipulated the spreadsheet he created with the intent to deny Rodgers any benefits.  Furthermore, Rodgers has not pointed to anything but conjecture or speculation to suggest that Whittinghill knew or was aware of Rodgers's use of, or right to, benefits when he made the decision to terminate her employment.  *See  Guy*, 2009 WL 1853168, at *14.  As a result, no reasonable finder of fact could find that Rodgers would not have been terminated had she not been entitled to benefits.  *Koons*, 367 F.3d at 777; *see also*

---

[11]Rodgers has filed a Motion to Strike (Filing No. 124) in an attempt to strike portions of Whittinghill's affidavit.  One specific aspect of her challenge relates to whether DTN adjusted Rodgers' production figures for the time that Rodgers was on FMLA leave.  Whittinghill did not include May 2007 when calculating Rodgers's production averages, but did include April 2007, in which Rodgers was on FMLA leave for part of the month.  However, to the extent that Whittinghill made his decision to terminate Rodgers's employment on the previous three months production figures, he would have excluded both April and March 2007 from his calculations.

[12]*See* Filing No. 99-4, at CM/ECF p. 2 (emphasis added) ("Sales Representatives must maintain a monthly average of $5,500 net new revenue.  *A Sales Representative who does not achieve $16,500 in first year new revenue in any 90-day period* or whose monthly first year revenue is less than $5,500 per month in any consecutive two-month period will be subject to disciplinary action up to and including termination, at the discretion of management."); *see also* Filing No. 99-3.

21

*Teetor*, 2010 WL 3789562, at *4.   Accordingly, as it relates to Rodgers's ERISA claim

against DTN, the Motion for Summary Judgment will be granted.

## III.  Wrongful Termination Claim Against DTN, Whittinghill, & Washburn

"In Nebraska, an employee asserting a breach of employment contract case must

initially prove the existence of an employment contract, its terms and his or her compliance

with those terms until termination, the employer's breach, and damages."[13] *Koenig v. CBIZ*

*Benefits & Ins. Services, Inc.*, 8:04CV486, 2006 WL 680887, at *10 (D. Neb. Mar. 10,

2006) (citing *Barks v. Cosgriff Co.,* 529 N.W.2d 749, 754 (Neb.1995)).  In the absence of

any contractual, statutory, or constitutional right to employment, "an employer may lawfully

discharge an employee whenever and for whatever cause it chooses."  *Blinn v. Beatrice*

*Cmty. Hosp. & Health Ctr., Inc.*, 708 N.W.2d 235, 245 (2006) (citing *Goff-Hamel v.*

*Obstetricians & Gyns., P.C.,* 588 N.W.2d 798 (Neb. 1999)).

This "'at-will' status can be modified by contractual terms that may be created by

employee handbooks and oral representations."  *Hebard v. Am. Tel. & Tel. Co., Inc.*, 421

N.W.2d 10, 12 (Neb. 1988) (citing *Jeffers v. Bishop Clarkson Memorial Hosp.,* 387 N.W.2d

692 (Neb. 1986); *Johnston v. Panhandle Co-op Assn.,* 408 N.W.2d 261 (Neb. 1987)).

However, in order to modify at-will employment, an employer must manifest "a clear intent

to make a promise as an offer of employment other than employment at will, and to be

bound by it, so as to justify an employee in understanding that a commitment has been

made."  *Miller v. Steele*, 8:06CV253, 2006 WL 4682254, at *5 (D. Neb. Aug. 23, 2006)

---

[13]"[W]hether 'a contract for . . . employment in favor of plaintiff existed' is a question of law."  *Milroy v. K-G Retail Stores, Inc.*, 819 F. Supp. 857, 861 n.2 (D. Neb. Apr. 8, 1983) (quoting *Johnson v. Panhandle Co-op Ass'n*, 408 N.W.2d 261, 265 (Neb. 1987)).

(citing *Blinn v. Beatrice Community Hosp. and Health Center, Inc.,* 708 N.W.2d 235, 245-46 (Neb. 2006)). There also must "be a binding mutual understanding between the parties to the alleged contract." *Foreman v. AS Mid-Am., Inc.*, 586 N.W.2d 290, 304 (Neb. 1998). An "offer" is determined by the "outward manifestations of the parties, not by their subjective intentions." *Miller*, 2006 WL 4682254, at *5. A disciplinary policy is generally not a manifestation of an intent to offer definite employment where it "address[es] nothing other than employee discipline," *Foreman*, 586 N.W.2d at 304, or allows the employer to exercise discretion to discipline its employees as it sees fit or to determine what conduct warrants discharge. *See Rains v. Becton, Dickinson and Co.*, 523 N.W.2d 506, 510 (Neb. 1994).

Rodgers does not dispute that DTN's 1993 Handbook established an at-will employment relationship between her and DTN. She does not contend that any of the Defendants made oral representations that resulted in the modification of her status as an at-will employee of DTN. She contends, however, that her at-will status was modified through DTN's 1994 Manual and 2007 Compensation Plan.

Rodgers claims that the 1994 Manual established a mandatory progressive disciplinary procedure to which DTN had to adhere before terminating an employee such as herself. The 1994 Manual, however, stated only that "[a] violation *may* result in some form of disciplinary action," and that "[e]ach department has a set of standards for job production . . . . Unsatisfactory production *can* result in Phases." (Filing No. 99-2, at CM/ECF p. 4. (emphasis added)). Although in a different section, the 1994 Manual also stated that a DTN employee's "[e]mployment is 'at will,' and an employee may be terminated at any time, with or without cause." (Filing No. 99-2, at CM/ECF p. 3.) The 1994

23

Manual stated that its list of specific behaviors that could impact the employee relationship with DTN was "not all-inclusive," and that "[o]ther situations or behaviors may also warrant discipline, suspension or termination.   Situations will be evaluated on a case-by-case basis."  (Filing No. 99-2, at CM/ECF p. 5.)  Thus, the language of the disciplinary policy indicates that DTN had discretion regarding how and when to discipline its employees, and also had the discretion to determine what conduct warranted discharge.

Furthermore, Rodgers did not sign the 1994 Manual, nor did DTN's president, chief executive officer, executive vice president, or any of its senior vice presidents (Filing No. 98-6, at 237:10-17; Filing No. 99-2), and to the extent that the 1994 Manual supplemented the 1993 Handbook as Rodgers contends, the 1993 Handbook stated:

> Employment with [DTN] remains "at-will."   No statement about future employment or longevity of employment may be made by anyone in the Company except in writing signed by the President, Executive Vice President, or a Senior Vice President of the Company and the employee.  No person may assure, either before or after the beginning of employment, any benefits or terms and conditions of employment, or make any agreement contrary to the personnel policies and practices of the Company unless in writing signed by the President, Executive Vice President or a Senior Vice President of the Company and the employee.  Any oral or written statements to the contrary should not be relied on by a prospective or existing employee.

(*Id.* at CM/ECF p. 10.)  Accordingly, based on the 1993 Handbook as supplemented by the 1994 Manual, no reasonable finder of fact could find that any of the Defendants manifested an intent to offer Rodgers anything other than at-will employment with DTN.  *See Rains*, 523 N.W.2d at 510.

Rodgers also claims that the 2007 Compensation Plan is ambiguous and sent her "mixed messages" regarding whether her at-will status had been modified.   However, the 2007 Compensation Plan stated that its contents "did not guarantee employment; rather

24

employment with DTN . . . c[ould] be terminated on an at-will basis by either the employee or DTN . . . for any reason other than those expressly prohibited by law." (Filing No. 99-4, at CM/ECF p. 3-4.) The 2007 Compensation Plan also made clear that the employment of an individual could be terminated, "for any reason," regardless of her status as a particpant in the plan.[14]   Based on this clear and unambiguous language in the 2007 Compensation Plan, no reasonable finder of fact could find that there was a manifestation of an intent to modify Rodgers's at-will employment.  *See Hebard*, 421 N.W.2d at 12 (Neb. 1988); *see also Hillie*, 512 N.W.2d at 361.

Rodgers has failed to satisfy her burden of demonstrating that an employment contract existed between her and any of the Defendants.  She has not pointed to any evidence indicating that any of the Defendants "manifest[ed] a clear intent to make a promise as an offer of employment other than employment at will, and to be bound by it, so as to justify [Rodgers] in understanding that a commitment has been made."  *Miller*, 2006 WL 4682254, at *5.  As a result, she could be "lawfully discharge[d] whenever and for whatever cause."  *Blinn*, 708 N.W.2d 235, 245 ( Neb. 2006).  Therefore, as it relates to Rodgers's claim for breach of contract or wrongful termination against DTN, Whittinghill, and Washburn, the Motion for Summary Judgment will be granted.

---

[14]*See* Filing No. 99-4, at CM/ECF p.3-4 (emphasis added):

Termination of Participant.  A Participant who is terminated from the Plan but remains an employee of the Company, or *whose employment with the Company is terminated for any reason, whether voluntarily or involuntarily*, 1) is no longer a Participant in the Plan, and 2) will receive no further commissions or bonuses under the plan, except Commissions or orders accepted by midnight of the day before the Participant is terminated from the Plan.

Accordingly,

IT IS ORDERED:

1.      The Defendants' Motion for Summary Judgment (Filing No. 96) is granted;

2.      Plaintiff Gloria Rodgers's Amended Complaint is dismissed, with

        prejudice;

3.      All other pending motions are denied as moot; and

4.      A separate Judgment will be entered.

DATED this 10th day of April, 2012.

                                BY THE COURT:


                                s/Laurie Smith Camp
                                Chief United States District Judge